**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Phillip Ray JETER, Defendant-Appellant.**

No. 84–5453.

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1985.

Decided Oct. 11, 1985.

Kepco, Inc., A. George Mason, argued, Director Land & Legal, Kingsport, Tenn., for defendant-appellant.

Louis DeFalaise, U.S. Atty., and Barbara B. Edelman, argued, Lexington, Ky., for plaintiff-appellee.

Before MERRITT and WELLFORD, Circuit Judges, and EDWARDS, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Defendant, Phillip Ray Jeter, appeals from his conviction on two substantive counts and one conspiracy count for illicitly obtaining and participating in the distribution of imprinted carbon sheets used in the typing of secret grand jury documents and proceedings. The three charges against Jeter were contained in an eight-count indictment also charging three other individuals, James Purdy Lambert, Anita Madden, and Marlene Halsey, who were acquitted. Jeter was found guilty of violating 1) the federal larceny statute (stealing of government property), 18 U.S.C. § 641; 2) the federal obstruction of justice statute, 18 U.S.C. § 1503; and 3) conspiring under 18 U.S.C. § 371 to violate these statutes (as well as Federal Rule of Criminal Procedure 6(e) and 18 U.S.C. § 401).

While in jail during the spring of 1983, Jeter apparently gained interest in media coverage of grand jury proceedings in Lexington surrounding reputed drug dealers

James P. Lambert and Arnold Kirkpatrick. Jeter wrote a sympathetic letter to co-defendant Madden, an associate of Lambert and Kirkpatrick, who had picketed outside a local television station protesting the unfair coverage about alleged illegal drug activities of her friends.

Jeter returned to Lexington in September 1983 and began to visit the apartment of co-defendant Halsey, a typist for a federal court reporter service. In October 1983, Halsey's employer gave her materials to type involving grand jury testimony from the Lambert investigation, and Halsey gave Jeter carbon papers used in typing these grand jury transcripts. The government introduced evidence at trial that the carbon paper in effect created a third copy of the transcripts which could easily be read and deciphered. The Justice Department was charged and paid $1.75 per original page and 90 cents per copy page for the transcript of grand jury proceedings.

Jeter soon thereafter arranged a meeting with grand jury target Lambert to show him a sample page of the carbon transcripts. Jeter explained that he wanted to get even with the government and thought that the government was also treating Lambert unfairly. Lambert, who knew Jeter only by reputation, refused to trust Jeter until a mutual friend vouched for Jeter. This mutual friend, Edwin Piper (who was not included in the indictment), eventually delivered the carbon transcripts to Lambert. Jeter eventually became a frequent visitor at Lambert's house. The government introduced evidence that Lambert instructed another associate, Rocco Lango, to give three hundred dollars ($300) to Jeter, apparently to cover some of his expenses.

Lambert took the carbon papers to his associate Madden, who was also the subject of discussion in the grand jury testimony. Madden retyped the transcript testimony from the carbon documents and made more copies. They then took copies of the retyped transcripts to grand jury target Kirkpatrick. Lambert also took a copy to his

attorney, who insisted that the copies be turned over to the court. Jeter and the others were then indicted and stood trial.

After trial and conviction, the court sentenced Jeter to a term of two years imprisonment each on the conspiracy count (Count 1) and the larceny of government property count (Count 3). The sentences were to be served concurrently. The court suspended sentence on the obstruction of justice count (Count 6) in favor of a five year probationary period after service of his sentence on the other two counts.

In this appeal Jeter makes a number of legal challenges to his three-count conviction. With respect to the conviction for larceny under 18 U.S.C. § 641, Jeter argues alternatively that 1) the carbon paper at issue does not fall within the meaning of government property or "thing of value," and 2) the value of the carbon paper does not exceed the requisite one hundred dollar ($100) minimum required for a felony conviction. Jeter contends in a similar vein that his use of the carbon paper does not fall within the federal obstruction of justice statute (18 U.S.C. § 1503). As to the conspiracy charge, he argues that the government insufficiently identified the illegal object of the conspiracy and also failed to introduce sufficient evidence for a conviction. Finally, Jeter argues that the larceny and obstruction of justice statutes must suffer from unconstitutional vagueness and overbreadth under the First and Fifth Amendments if applied to his breaches of grand jury secrecy.

Appellant Jeter essentially raises the same issues except those pertaining to the conspiracy count. This question is whether his activity falls outside the legitimate scope of the statutory felonies for which he was convicted—18 U.S.C. § 641 (larceny of government property) and 18 U.S.C. § 1503 (obstruction of justice).

He essentially suggests two reasons for believing that these statutes do not reach broadly enough to cover his illicit activity. First, he argues that the secrecy of grand jury proceedings is protected exclusively by the criminal contempt power under Federal

Rule of Criminal Procedure 6(e) and that the language of this secrecy rule precludes application of any other statutory framework. Second, he argues that the specific application of 18 U.S.C. § 641 and 18 U.S.C. § 1503 would require statutory constructions of their meaning that would fail due to constitutionally deficient overbreadth and vagueness.

▮ We must emphasize, therefore, the precise nature of the essential question raised by the appellant. The appellant nowhere argues that his own activity is beyond the boundaries of criminal punishment due to protection by the First Amendment.[1] He nevertheless claims that no constitutionally valid construction of any statute presently covers his activity. According to Jeter, Rule 6(e) is the exclusive means of punishment for grand jury secrecy violations and the rule is not applicable to him.

At issue here are: 1) an indisputably broad-gauged statutory prohibition against interference with the federal system of justice (18 U.S.C. § 1503); 2) a statutory framework that plainly prohibits the taking of any "thing of value" from the government (18 U.S.C. § 641); and 3) a federal rule triggering the criminal contempt power for use as a sanction against the violation of grand jury secrets (Rule 6(e)). We find no reasonable basis for Jeter's argument that his activity deserves First Amendment protection. We seriously consider his argument that either or both of the two specific statutes chosen here in the prosecution and conviction of Jeter do not apply to his activity.

**I. WHETHER RULE 6(e) APPLIES TO JETER'S ACTIVITY AND/OR PRECLUDES PUNISHMENT UNDER ANY OTHER STATUTORY RULE.**

We first address Jeter's argument that Rule 6(e)(2) of the Federal Rules of Criminal Procedure constitutes "the sole and exclusive means of safeguarding the secrecy of grand jury testimony." Rule 6(e)(2), titled "General Rule of Secrecy" pertaining to federal grand juries, provides:

> *A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision* shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. *No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.*

(Emphasis added). The above referenced provision, Rule 6(e)(3)(A)(ii), adds another group to the list covered by this secrecy rule. This group, according to Rule 6(e)(3)(A)(ii), is composed of

> (ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

▮ Rule 6(e)(2) represents the main statutory expression of the common pre-

---

**1.** Appellant Jeter, in any event, could not make a credible claim that his passing of secret grand jury information was somehow deserving of First Amendment protection. In *Frohwerk v. United States*, 249 U.S. 204, 206, 39 S.Ct. 249, 250, 63 L.Ed. 561 (1919), Justice Holmes stated: "We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counseling of a murder ... would be an unconstitutional interference with speech." By the same token, no one would suppose that criminal punishment of a scheme to transmit secret grand jury information exclusively to suspected grand jury targets represents an uncon-

stitutional interference with speech. *See Douglas Oil Company v. Petrol Stops Northwest*, 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979) ("proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings"); *United States v. Johnson*, 319 U.S. 503, 513, 63 S.Ct. 1233, 1238, 87 L.Ed. 1546 (1943) (secrecy of grand jury proceedings as "indispensable" to system of justice); *see also* 1 C. Wright, *Federal Practice & Procedures* § 106, at 244 (1982) ("The great importance of preserving the secrecy of the grand jury while the grand jury is still considering a matter can hardly be questioned").

sumption that grand jury proceedings should remain secret. *See United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958); *see also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979). By its own terms, however, "Rule 6(e) applies ... *only* to individuals who are privy to the information contained in a sealed document by virtue of *their positions in the criminal justice system.*" *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir.1984) (emphasis added), *aff'd,* —— U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *see also Fund For Constitutional Government v. National Archives*, 656 F.2d 856, 870 n. 33 (D.C.Cir. 1981); 1 C. Wright, *Federal Practice & Procedure* § 106, at 146 n. 13 (1982).

Jeter is thus correct in arguing that he is not one of the persons on which Rule 6(e)(2) imposes the responsibility of secrecy. He had no official right to be present or to transcribe grand jury testimony and proceedings. We cannot expand the grand jury secrecy rule beyond the plain language of Rule 6(e)(2) in order to encompass Jeter.

█ On the other hand, however, the plain language of Rule 6(e)(2) does not support that part of Jeter's contention that this rule somehow forbids punishment of unjustified grand jury disclosures under any other statutory rule. Rule 6(e)(2) states: "No obligation of secrecy may be imposed on any person except in accordance with this rule." The surrounding language clearly supports the view that this limitation refers only to action against the aforementioned class of individuals who owe a formal and on-going obligation of secrecy due to their connection with the grand jury—"[a] grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the govern-

ment, or *any person* to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision [i.e., other necessary governmental personnel]" [emphasis added]. It is simply illogical to attempt to construe Rule 6(e)(2) as *mandating* that all other classes of individuals can act to destroy the secrecy of grand jury proceedings without criminal sanction.[2]

## II. WHETHER JETER'S ACTIVITY CONSTITUTED OBSTRUCTION OF JUSTICE UNDER 18 U.S.C. § 1503.

The obstruction of justice statute, 18 U.S.C. § 1503, specifically forbids the influencing, intimidation, or impeding of any witness, juror, or court official. The statute also contains an omnibus clause, which punishes the general obstruction of the "due administration of justice." The omnibus clause covers "whoever ... *corruptly* or by threats of force, or by any threatening letter of communication, influences, obstructs, or impedes, *or endeavors to influence, obstruct, or impede*, the due administration of justice" [emphasis added].

█ As the Second Circuit has noted, "the key words in the statute [section 1503] are 'corruptly' and 'endeavors.'" *United States v. Cioffi*, 493 F.2d 1111, 1118–1119 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974). The statutory language clearly encompasses "endeavors" or *attempts* to obstruct the administration of justice regardless of the success in actual obstruction. *See United States v. Russell*, 255 U.S. 138, 139–40, 41 S.Ct. 260, 65 L.Ed. 553 (1921) (construing similar language in predecessor statute); *Cioffi*, 493 F.2d at 1119 ("The endeavor, whether successful or not, is the gist of the offense."). The obstruction of justice statute also contains a clear *mens rea* requirement that limits its scope to those who "corruptly" or *intentionally* seek to ob-

---

**2.** While Rule 6(e)(2) supplies "the general provision for secrecy *in order to give effect to and protect [grand jury] sealed records.*" *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir.1984), *aff'd* —— U.S.

——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), it also prescribes and limits the exercise of the court's criminal contempt powers for all disclosure mentioned in Rule 6(e). *See, e.g.,* Rules 6(e)(1), (e)(2), (e)(4), (e)(6).

struct the due administration of justice. *See Cioffi, supra,* 493 F.2d at 1119.

We first look to the construction of the omnibus clause in 18 U.S.C. § 1503 to determine whether it reaches the specific kind of attempt launched by Jeter. In *United States v. Howard,* 569 F.2d 1331 (5th Cir.), *cert. denied sub nom. Ritter v. United States,* 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978), the Fifth Circuit cited and concurred with numerous courts embracing the view that "the omnibus clause aims at obstruction of justice itself, regardless of the means used to reach that result." *Id.* at 1334–35. *See also United States v. London,* 714 F.2d 1558, 1566–67 (11th Cir.1983) (citing and following *Howard*). In *Howard,* as in the instant case, the defendants were accused of selling secret grand jury testimony. The *Howard* court stated that "[i]f bribing a judge to disclose secret grand jury material constitutes an obstruction of justice, then so does appropriation and disclosure of that material [under the omnibus clause], for the result is the same, the secrecy of the proceeding is breached." 569 F.2d at 1335–1336.

*Howard* provides substantial precedent for supporting a conviction of Jeter under 18 U.S.C. § 1503.[3] Jeter, nevertheless, argues that this court has adopted a more restrictive view of the omnibus language of 18 U.S.C. § 1503.

In *United States v. Essex,* 407 F.2d 214 (6th Cir.1969), this court heard the appeal of a defendant who had been convicted under § 1503 for false trial testimony. In considering whether the omnibus clause reached acts of perjury, we stated:

> As a criminal statute 18 U.S.C. § 1503 requires strict construction. The general clause at its end, moreover, must be read to embrace only acts similar to those mentioned in the preceding specific language. *Haili v. United States,* 260 F.2d 744 (9th Cir.1958).

*Id.* at 218. *Essex* clearly invoked the rule regarding strict construction of criminal statutes known as *ejusden generis.*[4] In *Essex* we decided that 18 U.S.C. § 1503 failed to reach such acts of false testimony, but only because the specific statutory charge of perjury, 18 U.S.C. § 1621, was clearly tailored to cover that particular criminal action. In the instant case there is

**3.** In *Howard* the Fifth Circuit decided whether the two defendants could be prosecuted under 18 U.S.C. § 1503. In *dictum* the *Howard* court stated that the two defendants "defined *Rule 6(e)* by selling the transcripts." *Id.* at 1336. We find this *dictum* statement in *Howard* as insufficient support for the view that Rule 6(e) also *actually covers Jeter.* Rule 6(e) may still have applied to at least one of the *Howard* defendants (Ritter) because he was a "court reporter," *id.* at 1335 n. 7, and thus apparently one of those necessary government personnel explicitly covered under Rule 6(e). The *Howard* opinion appears to treat the other defendant as having the same status as the court reporter. Its statement on Rule 6(e), therefore, may not conflict with our understanding about the limited reach of Rule 6(e)(2). In any event, *Howard* does not support Jeter's view about the exclusivity of Rule 6(e)(2) because the convictions under Section 1503 were upheld.

In *United States v. Friedman,* 445 F.2d 1076 (9th Cir.), *cert. denied sub nom. Jacobs v. United States,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), the Ninth Circuit considered the appeal of two defendants who had been convicted on numerous counts for involvement in a scheme to distribute grand jury transcripts. Although

not grand jury personnel, the defendants were convicted at trial, among other things, for obstruction of justice under Section 1503 *and* violation of Rule 6(e). On appeal the Ninth Circuit refused to reach the defendants' challenge to the Rule 6(e) convictions because it represented a concurrent sentence and its elimination would not reduce the defendants' sentence. 445 F.2d at 1089; see *Benton v. Maryland,* 395 U.S. 784, 790, 89 S.Ct. 2056, 2060, 23 L.Ed.2d 707 (1969) (discretionary use of "collateral sentence" doctrine). Thus *Friedman* takes no contrary position that persons other than grand jury employees can be punished under Rule 6(e)(2).

**4.** The rule of *ejusdem generis* states that:
> where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned [citations omitted]. The rule, however, does not necessarily require that the general provision be limited in its scope to the identical things specifically named. Nor does it apply when the context manifests a contrary intention.

BLACK'S LAW DICTIONARY 464 (5th ed. 1979).

no such obviously applicable statutory charge limiting the scope of the omnibus clause.

■■■■ Contrary to Jeter's argument, this court has never held that obstruction under the omnibus clause must stem from "intimidating actions." In *United States v. Metcalf,* 435 F.2d 754, 757 (9th Cir.1970), the Ninth Circuit endorsed this severe limitation as being required by *ejusdem generis.* Such limiting of the omnibus clause to "intimidating actions," however, is not justified by the necessary symmetry between the statute's specific and general criminal prohibitions under *ejusdem generis.* The initial specific prohibitions in 18 U.S.C. § 1503 clearly cover more than "intimidating actions." The plain language there applies to "whoever *corruptly, or* by threats of force, *or* by any threatening letter of communication, *endeavors to* influence, intimidate, or *impede*" any witness, or court official. 18 U.S.C. § 1503 (emphasis added). The first specific part of the statute thus covers the *corrupt* but not necessarily *coercive* bribery and other illicit persuasion of judges, witnesses, or other officials. Thus, according to the principles of *ejusdem generis,* the omnibus clause can also apply to non-coercive conduct used by Jeter to obtain the grand jury information from his typist friend.

In *United States v. Faudman,* 640 F.2d 20 (6th Cir.1981), this court specifically rejected the intimidating actions limitation. We explicitly refused to follow "the more restrictive view of the statute [18 U.S.C. § 1503]" espoused in *Metcalf. Id.* at 22. We held that the omnibus clause reached a defendant who purposefully altered or destroyed corporate records sought in a grand jury investigation. *Id.* In the subsequent case of *United States v. Schaffner,* 715 F.2d 1099 (6th Cir.1983), we reiterated our rejection of the *Metcalf* limita-

tion. We specifically rejected the argument advanced by defendant that § 1503 covers only "obstruction of justice achieved through force or intimidation," *id.* at 1103, and affirmed that the omnibus clause could be applied against a defendant who hid a witness from testifying before the grand jury. The Ninth Circuit itself has recently repudiated the *Metcalf* intimidating action limitation as mere "dicta" that does not accurately reflect the law in that circuit. *See United States v. Rasheed,* 663 F.2d 843, 851–52 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *United States v. Lester,* 749 F.2d 1288, 1293 n. 3 (9th Cir.1984).

We are satisfied that no rule of statutory construction prevents Section 1503 from applying to Jeter's conduct in this case. His activity can reasonably be characterized as an attempted obstruction of justice within the meaning of the statute. *United States v. Howard, supra.*

Appellant Jeter also complains that the use of the omnibus clause in § 1503 to reach his activity necessarily involves an overbroad construction in violation of the First Amendment. Jeter is thus complaining that any construction encompassing this statute is constitutionally invalid "not because ... [his] own rights of free expression are violated, but because the existence [of the statutory construction] ... may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973).[5]

■■■ Jeter similarly complains that use of the omnibus clause against his activity involves a statutory construction that is void-for-vagueness under the due process clause of the Fifth Amendment. Jeter thus complains that any construction covering his activity would transform Section 1503 into

---

5. We note that some members of the Court have denounced this exceptional aspect of First Amendment jurisprudence as an attempt at "playing 'Hamlet' without Hamlet," *Winters v. New York,* 333 U.S. 507, 527, 68 S.Ct. 665, 675, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting), and as deciding "abstract, academic questions,"

*Saia v. New York,* 334 U.S. 558, 571, 68 S.Ct. 1148, 1155, 92 L.Ed. 1574 (1948) (Jackson, J., dissenting) on the basis of "irrational imaginings," *Aptheker v. Secretary of State,* 378 U.S. 500, 525, 84 S.Ct. 1659, 1673, 12 L.Ed.2d 992 (1964) (Clark, J., dissenting).

a statute drafted in "terms so vague that men of common intelligence must necessarily guess at its meaning, and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Jeter's Fifth Amendment void-for-vagueness argument is intertwined with his First Amendment overbreadth argument. We agree with the view that "whenever an overbroad law covering first amendment activities and formless standards of first amendment privileges are conjoined, the result is an operative, injurious legal reality suffering due process vagueness." Note, *The First Amendment Overbreadth Doctrine*, 83 HARV.L.REV. 844, 871 (1970).[6]

In this particular case application of the overbreadth doctrine is inappropriate. In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Supreme Court limited application of the overbreadth doctrine by stating that "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2917. We cannot accept a speculative premise that all possible constructions of the obstruction statute encompassing Jeter's activity have a substantially chilling effect on First Amendment rights.

We can see no constitutionally cognizable speech-act in Jeter's conduct in this case. Rather than publish the information to the general public, Jeter clearly attempted to keep his illicit action *secret* from all persons but the grand jury targets and his other co-conspirators.[7] His conduct would seem to constitute merely another type of ordinary criminal communication in a conspiracy that has been traditionally found undeserving of any First Amendment protection. *See Frohwerk*, 249 U.S. at 206, 39 S.Ct. at 250 (cited at n. 1 *supra*).[8]

> [T]he primary conduct which is affected by the law at issue must to a substantial extent be *the kind of expressive and associational behavior which at least has a colorable claim to the protection of the [First] [A]mendment.*

Note, *The First Amendment Overbreadth Doctrine*, 83 HARV.L.REV. 844, 860 (1970) (emphasis added). An ordinary expression of conspiratorial intent as demonstrated by Jeter is not the kind of expressive or associational behavior with even a colorable claim to First Amendment protection.

The obstruction of justice statute requires neither unconstitutionally overbroad or vague application to Jeter's conduct, since he failed to establish that some protected constitutional activity regarding the passing of grand jury information must

---

6. [A]n overbroad statute covers both "A," which is unprotected activity, and "B," which is privileged; a vague statute may on a restrictive reading be confined to "A," but on some reasonable readings its terms reach "B." In either case, an actor wishing to engage in privileged activity is inhibited by doubt as to his immunity from statutory burdens.
 83 HARV.L.REV. at 871 n. 104.

7. In numerous cases the Court has emphasized the importance to First Amendment values of a free flow of *public* information. *See, e.g., Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). In the recent case of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, —— U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), however, the Supreme Court emphasized that a commercial credit report "made available to

*only five subscribers*, who, under the terms of the subscription agreement, could not disseminate it further" failed to trigger "any 'strong interest in the free flow of commercial [or any other kind of] information'", 105 S.Ct. at 2947 (quoting *Virginia Pharmacy Board*). The passing of secret grand jury information exclusively between Jeter and the grand jury targets here has even less relation to this principal First Amendment interest regarding a free flow of public information.

8. *See also* Note, *The First Amendment Overbreadth Doctrine*, 83 HARV.L.REV. 844, 860 (1970) (noting that "the activities affected by 'conspiracy laws ... in the great run of situations bear no colorable claims to First Amendment protection."); *see generally* Van Alstyne, *A Graphic Review of the Free Speech Clause*, 70 CALIF.L.REV. 107, 115–120 (1982); and Greenwalt, *Speech and Crime*, 1980 AM.BAR FOUND. RESEARCH J. 645.

also fall within § 1503 if the statute is construed to prohibit his particular activity. We hold that the obstruction of justice statute as applied and construed here passes the constitutional test set out in *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), in a fashion that also proves its lack of vagueness.

The obstruction of justice statute possesses a limited standard of culpability that confines its coverage to constitutionally unprotected activity, which stems from its explicit *mens rea* requirement that a person must "corruptly" endeavor to interfere with the due administration of justice. Thus one must impede the due administration of justice with the general intent of knowledge *as well as the specific intent of purpose to obstruct. Pettibone v. United States*, 148 U.S. 197, 207, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893) ("the specific intent to violate the [obstruction of justice] statute must exist to justify a conviction"); *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir.1981) ("We hold that the word 'corruptly' as used in the statute [Section 1503] means that the act must be done with the *purpose* of obstructing justice") (emphasis added), *cert. denied sub nom. Phillips v. United States*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *United States v. Ogle*, 613 F.2d 233, 237 (10th Cir.1979) ("specific intent requiring a bad motive is part of the crime"), *cert. denied*, 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980); *United States v. Haas*, 583 F.2d 216, 220 (5th Cir.1978) ("[K]nowledge and intent are necessary to sustain a conviction.... It is settled that these two elements are necessary ingredients of an offense" under Section 1503), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979).

We simply are not dealing in this case with non-corrupt legitimate disclosures of grand jury material. We are also not dealing with inadvertent, negligent, or even reckless non-purposeful disclosures. The reach of the statute is clearly limited to such constitutionally unprotected and purportedly illicit activity as that undertaken by Jeter; therefore its application to Jeter is neither overbroad under the First Amendment nor void-for-vagueness under the Fifth Amendment.[9]

## III. WHETHER JETER'S ACTIVITY CONSTITUTED A LARCENY INVOLVING A "THING OF VALUE" EXCEEDING THE $100 FELONY REQUIREMENT.

The federal larceny statute, 18 U.S.C. § 641, applies to

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record ... or *thing of value of the United States* ... or

Whoever receives, conceals, or retains the same with intent to convert it to his own use or gain, knowing it to have been embezzled, stolen, purloined or converted

In order to convict a person of a felony under 18 U.S.C. § 641, the government must show proof beyond a reasonable doubt that the stolen government property had value in excess of $100. *United States v. DiGilio*, 538 F.2d 972, 978 (3d Cir.1976), *cert. denied sub nom. Lupo v. United States*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The statute declares that one who steals government property

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100 he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

---

**9.** Grand jury personnel who are punished with contempt for a "knowing" violation of Rule 6(e) cannot also be punished under the obstruction of justice statute for disclosures unless they possess a sufficiently purposeful "corrupt" intent. *See* Fed.R.Crim.P. 6(e) advisory committee note 2. ("The rule [Rule 6(e)] does not impose any obligation of secrecy on witnesses"). We are not here called upon to decide whether under some circumstance any information obtained from a witness and then published could constitute an *obstruction* under the statute regardless of the publisher's intent.

The word "value" means face, par or market value, or cost price, either wholesale or retail, whichever is greater.

The government prosecuted and the jury convicted Jeter under § 641 on the theory that the secret grand jury *information* in the carbon discard paper constituted a "thing of value" in excess of $100. As one form of proof, the government introduced testimonial evidence about the price paid for the transcript original and a copy ($173.25 for the originals and $89.10 for the copy). The government also refers to other transcript originals and copies in another investigation which Jeter apparently received from the typist-acquaintance. The cost of all received transcripts and originals would then have totalled $350.

The government also emphasized evidence indicating that Lambert authorized the transfer of $300.00 to Jeter. The government claims that this transfer in effect represented consideration for the materials furnished through Jeter's efforts. Thus this $300 exchange, according to the government, represented the price for the "information" on the "thieves' market." *See Digilio, supra,* 538 F.2d at 979 ("value may be established by reference to a thieves' market" in Section 641 charge); *see United States v. Solimine,* 536 F.2d 703, 708 (6th Cir.1976) (recognizing concept of thieves' market but not in Section 641 case), *cert. denied sub nom. Sclafani v. United States,* 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 596 (1977).

The crux of the government's theory is its treatment of information as property or a "thing of value" under the statute. The tangible property entity constituted by the carbon discard material otherwise could certainly not represent a "thing of value" over $100 and involve anything more than a misdemeanor violation. The government's reliance on the information as the prime "thing of value" raises a question as to whether Section 641 should be construed as applying only to tangible forms of property or things of value. If not, we must consider whether Jeter's distribution of the information constituted one of the larcenous activities proscribed by Section 641. Finally, we consider if "information" in the statutory construction of "thing of value" is constitutionally invalid on First Amendment overbreadth or Fifth Amendment vagueness grounds.

▄▄ On the question of whether Section 641 "thing of value" involves both intangible and tangible property forms, this court has held in the affirmative. *See Burnett v. United States,* 222 F.2d 426 (6th Cir.1955) (affirmed conviction under Section 641 for wrongful use of services and labor performed by government employees); *see also United States v. Croft,* 750 F.2d 1354, 1362 (7th Cir.1984) (endorsing *Burnett's* view of Section 641). The Congress' very use of the more expansive "thing of value" rather than "property" strongly implies coverage beyond mere tangible entities. *See United States v. Troung Dinh Hung,* 629 F.2d 908, 924 (4th Cir.1980) (separate section of opinion by Winter, J., reaching Section 641 issue that two other judges did not reach in espionage case); *contra Chappell v. United States,* 270 F.2d 274 (9th Cir.1959) (disagreeing with *Burnett* and holding the intangible value of government employee's labor to be beyond scope of Section 641).

▄▄ The next question—whether Jeter's conduct constitutes a larcenous activity proscribed by Section 641—also deserves a clear affirmative response. Jeter argues vigorously that he does not represent one who "embezzles, steals, purloins, or knowingly converts ..." under Section 641 *because the government did not lose the possession of any informational property due to his activities*. But the government indicted Jeter under Section 641 not by simply invoking the litany of embezzlement, stealing and/or conversion. The government charged that Jeter

did willfully and knowingly embezzle, steal, purloin and convert to his own use and the use of others, *and without authority did sell, convey and dispose of records and things of value of the United States,* the value of which is in excess of $100.00, to wit, carbon paper and the

information contained therein relating to matters occurring on October 5, 1983, before a grand jury .... [emphasis added].

This second half of Jeter's Section 641—regarding unauthorized selling, conveying, and disposing of records and/or things of value to the United States government—describes a set of distinguishable activities that are alone sufficient for conviction under Section 641.[10] And we hold that the evidence clearly could have convinced a reasonable jury that Jeter was guilty of such activity proscribed by Section 641.

█ The last question regarding construction of Section 641 turns again to the claims of First Amendment overbreadth and Fifth Amendment vagueness. Like the obstruction of justice statute, Section 641 possesses some limiting standards for conviction. First, Section 641 applies only to those conveyances of government property made "without authority." Thus many officials may routinely pass on government information without running afoul of the statute. In *Morrissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952), moreover, the Supreme Court flatly rejected the idea that Section 641 contained a strict liability standard and held that the statute contained a traditional criminal intent standard for all proscribed activities. Therefore, while not apparently requiring the "specific intent" of purposeful action, *id.* at 265, 72 S.Ct. at 250, found in the obstruction of justice statute, Section 641 still requires the traditional criminal *mens rea* of "knowing" action. Thus a disclosure of valuable information that was merely 1) inadvertent, 2) negligent, or 3) too reckless would fail to trigger the criminal prohibitions of Section 641.

█ Under the obstruction of justice statute, as noted heretofore, a person must have the specific intent *to obstruct justice* in making a disclosure. Under Section 641, if "information" is construed as a statutory "thing of value," a person must possess only the knowledge that he or she is transmitting government information to be guilty of a criminal offense. This distinction raises First Amendment concerns, and also concerns about vagueness under the Fifth Amendment.

At least three other circuits have addressed or touched on this question whether "information" constitutes government property or "thing of value" under Section 641. None, however, have faced this particular situation involving a constitutional challenge from a defendant party, not a government employee.

In *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied sub nom. Jacobs v. United States*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), the Ninth Circuit defined "the information" contained in grand jury transcripts as the statutory "thing of value" under Section 641. The *Friedman* court went on to uphold a jury conviction under Section 641 for two indicted parties who were found with secret grand jury transcripts of their trial. However, neither defendant party in *Friedman* raised any constitutional issue regarding the inclusion of "information" within the statutory definition of a "thing of value." *See* 445 F.2d at 1087 (noting the absence of any argument that "as a matter of law, the information contained in the transcripts was not government property.")

In *United States v. Digilio*, 538 F.2d 972 (3d Cir.1976), *cert. denied sub nom. Lupo*

---

10. It should be remembered that the statute, in relevant part, targets

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, *or* without authority, sells, conveys, or disposes of any record ... or thing of value of the United States.... [emphasis added].

Thus the government only had to convince the jury that Jeter was either guilty of either the embezzlement/stealing/conversion half or the selling/conveying/disposing half of Section 641.

Jeter's argument here attempts to follow the lead of the analysis presented by Prof. Nimmer in *National Security Secrets v. Free Speech: The Issues Left Undecided In the Ellsberg Case*, 26 STANF.L.REV. 311, 315–23 (1974). The language of the government's indictment against Jeter, however, clearly exempts it from the statutory argument launched by Prof. Nimmer.

*v. United States*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), the Third Circuit affirmed jury convictions under Section 641 for defendant parties who procured copies of documents from FBI files. The *Digilio* Court, however, also did not reach the First Amendment overbreadth and Fifth Amendment vagueness issues raised by the appellants. The defendants in *Digilio* had obtained copies of FBI records through unauthorized use of government copying machines by a government employee confederate. Thus, in *Digilio* the copies themselves were made at government expense and constituted government property. In essence, therefore, the *Digilio* Court held that the tangible property itself constituted the entity of the value under Section 641 and stated that "we need not in this case decide whether appropriation of information falls within § 641." 538 F.2d at 978.

In *United States v. Girard*, 601 F.2d 69 (2d Cir.1979), the Second Circuit affirmed a jury conviction under Section 641 for the unauthorized transmission and selling of information from the federal Drug Enforcement Agency (DEA). The defendants in *Girard* were a DEA agent and a confederate who formerly worked for DEA. The *Girard* court thus in part rejected claims of First Amendment overbreadth and Fifth Amendment vagueness by stating that the defendants "must have known that the sale of confidential DEA records was prohibited. The DEA's own rules and regulations forbidding such disclosure may be considered as both a delineation and a clarification of the conduct proscribed by statute." 601 F.2d at 71. Subsuming the vagueness claim into that of First Amendment overbreadth, the *Girard* Court went on to reject the necessity of conducting such an analysis under the circumstances. *Id.*

Although all these other Section 641 cases have some distinguishing aspects, we follow the lead of *Girard* in deeming the instant application of Section 641 inappropriate for First Amendment overbreadth (or Fifth Amendment vagueness) scrutiny.

Here we are confronted with a virtually *de minimis* speech activity under the First Amendment involving communication of secret grand jury information exclusively to a handful of people in a small conspiratorial group, targets of a grand jury investigation. Jeter ultimately received $300 in exchange for passing on these grand jury secrets to this small group, not to anyone else. Jeter is undoubtedly guilty of selling something that the United States rightfully desired to keep in its exclusive possession, a "thing of value." We find no difficulty in holding that such conduct in this kind of limited circumstances violates Section 641. We do not attempt to determine the constitutionality of Section 641 in a "Pentagon Papers" kind of situation.

Considering alternative bases for our holding on the application of Section 641 to the facts of this case, we note that the "concurrent sentence" doctrine might be invoked. *See Barnes v. United States*, 412 U.S. 837, 848, 93 S.Ct. 2357, 2364, 39 L.Ed.2d 380 (1973); *United States v. Boyce*, 594 F.2d 1246, 1252 (9th Cir.), *cert. denied*, 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1979); *Ethridge v. United States*, 494 F.2d 351 (6th Cir.), *cert. denied*, 419 U.S. 1025, 95 S.Ct. 504, 42 L.Ed.2d 300 (1974); *United States v. Gallo*, 763 F.2d 1504 (6th Cir.1985); *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). Since concurrent sentences were imposed on counts one and three, we could follow the lead of these cases which have avoided deciding an issue whose resolution in favor of defendant would not reduce his sentence. We do not rest our Section 641 holding on this doctrine, but merely note its applicability.

## IV. WHETHER THE GOVERNMENT ESTABLISHED THE REQUISITE ELEMENTS OF THE CONSPIRACY COUNT.

 Count 1 of the indictment clearly charges Jeter and other defendants with the conspiratorial object and purpose of obstructing justice under 18 U.S.C. § 1503

and the stealing of government property under 18 U.S.C. § 641. This count sufficiently advises defendant of the nature of the criminal charge. *See Davis v. United States*, 253 F.2d 24, 25 (6th Cir.1958) (rejecting argument that conspiracy count must list with "technical precision" all elements; reference to a "specific section of the statutes is sufficient"). Even if the alleged theft of government property is questionable, the obstruction of justice charge is an unquestionably sufficient charge as to the "object" of the conspiracy. The indictment includes the other two required conspiracy elements of 1) an alleged overt act in furtherance and 2) an alleged agreement. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

■■■ Jeter argues that the government failed to present sufficient evidence establishing that someone else conspired with Jeter. His brief emphasizes that the other indicted co-conspirators (Madden, Lambert, and Halsey) were acquitted. Yet, as the government contends, the evidence could still have convinced the jury that Jeter conspired with unindicted "go-between" Edwin Piper, who brought Jeter together with Lambert and delivered the grand jury carbon papers to Lambert. *See United States v. Sandy*, 605 F.2d 210, 215–16 (6th Cir.), *cert. denied sub nom. Friedlander v. United States*, 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979) (even though a number of co-conspirators are found not guilty, evidence can connect a defendant and an unindicted co-conspirator). We find that the government did sufficiently charge Jeter with conspiracy, and that it presented adequate proof to sustain a conspiracy conviction.

## CONCLUSION

In summary, we find none of Jeter's arguments convincing, and we accordingly AFFIRM the convictions on each of the counts.

MERRITT, Circuit Judge, dissenting.

Neither the federal theft statute, 18 U.S.C. § 641, nor the obstruction of justice statute, 18 U.S.C. § 1503, should be interpreted as criminalizing the misuse or misappropriation of secret grand jury testimony or other similar confidential judicial information. Neither statute expressly makes the appropriation of such information a crime. Improper conduct respecting grand jury and other confidential judicial information should be punished, as it traditionally has been, by civil and criminal contempt proceedings.

The proper functioning of our grand jury system does depend upon the secrecy of grand jury proceedings, *Douglas Oil Co. v. Petro Stops Northwest*, 441 U.S. 211, 218–19, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979), but the policy of secrecy has historically been enforced by the courts through the use of the contempt power. *See* Note, *The Grand Jury as an Investigatory Body*, 74 Harv.L.Rev. 590, 600–01 (1961). Misappropriation of secret grand jury records or transcripts violates Federal Rules of Criminal Procedure 6(e)(1), (4) and (6) which require that the records of federal grand jury proceedings be kept secret, in the custody or control of the government or under seal. A person violating this rule may be punished for contempt under 18 U.S.C. § 401(3), which gives the court the power to punish contempts in violation of a "court rule or order." The procedure in such a contempt proceeding is that prescribed by Fed.Rule Crim.Pro. 42(b): disposition upon oral notice by the judge in open court on application of the court or the U.S. Attorney with adequate time allowed for the preparation of the defense and a reasonable statement of the factual basis and nature of the proceeding.

The virtue of utilizing the contempt power is that it can be narrowly focused on a specific violation of Rule 6(e), the misappropriation and disclosure of secret records, can be exercised in accordance with the procedural safeguards provided by Rule 42(b), and, consistent with the court's role in controlling and safeguarding the grand jury proceeding, need not be exercised at all if the court concludes in its discretion

that the violation of secrecy had no harmful effect on the grand jury investigation.

The court's rejection of this traditional approach to the problem of unauthorized disclosure of grand jury records raises serious First Amendment problems. Section 641, the theft statute, contains no standard for determining when a person is to be held criminally liable as one who "converts to his use or the use of another, or without authority, sells, conveys, or disposes of any ... thing of value of the United States." *See United States v. Troung Dinh Hung*, 629 F.2d 908, 924–25 (4th Cir.1980), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); *United States v. Hubbard*, 474 F.Supp. 64, 80 (D.D.C.1979). Under the court's interpretation, the statute could be used to punish any disclosure or misappropriation of information made "without authority" even though Rule 6(e) specifically provides that "[n]o obligation of secrecy may be imposed on any person except in accordance with this rule," and the Advisory Committee Note on Rule 6(e) states that "the rule does not impose any obligation of secrecy on witnesses."

The only reasoned support for the majority's construction of the theft statute is *United States v. Girard*, 601 F.2d 69, 71 (2d Cir.1979),[1] which rejected a First Amendment overbreadth challenge to section 641 because Drug Enforcement Agency rules and regulations forbade disclosure of computerized informant lists and delineated the conduct proscribed by the theft statute. The government's argument that criminalizing misuse of government information under the theft statute, which itself contains no limiting standard and which has been interpreted to criminalize a broad, open-ended range of wrongful takings, well beyond the confines of the common law, *Morissette v. United States*, 342 U.S. 246, 266 n. 28, 271, 72 S.Ct. 240, 254, 96 L.Ed.

288 (1952), cannot be upheld against vagueness and overbreadth merely because the misappropriation of some particular kinds of government information is clearly prohibited by some *other* statute or rule. *See* Nimmer, *National Security Secrets v. Free Speech: The Issues Left Undecided in the Ellsberg Case*, 26 Stan.L.Rev. 311, 322 (1974) (suggesting that if unauthorized dissemination of government information constitutes "conversion" under section 641 then that section is overbroad and is as violative of the First Amendment as the numerous parade ordinances struck down as overbroad because they lacked standards to guide officials in granting parade permits).

In reaching the conclusion that the misappropriation of government grand jury information is also punishable under the obstruction of justice statute, section 1503, the court relies exclusively on *United States v. Howard*, 569 F.2d 1331 (5th Cir.), *cert. denied sub nom. Ritter v. United States*, 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978). The court in *Howard* construed the omnibus clause of section 1503 punishing "whoever ... corruptly or by threats of force, or by threatening letter of communication, influences, obstructs, or impedes, or endeavors to influence, obstruct or impede, the due administration of justice" as covering the sale of grand jury transcripts. It mistakenly found that this broad reading of the statute was "confirmed" by legislative history showing that section 1503 was intended to cover contempts occurring outside the presence of the court, while only contempts occurring within the court's presence were intended to be punished under the contempt statute, section 401. The court then reasoned as follows:

> In its current form, section 401 proscribes disobedience or resistance to a

---

1. *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied sub nom. Jacobs v. United States*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), affirmed a conviction under both the contempt statute and the theft statute for a conspiracy to obtain secret grand jury recorded testimony. As noted above, the contempt conviction, for violating Rule 6(e) by possessing and disclosing unreleased grand jury recorded testimony, was the proper means of punishment; in any event, the court's opinion in *Friedman* simply does not discuss the issue of whether the misappropriation of grand jury information should be punished under the theft statute.

court rule, such as Rule 6(e), which requires grand jury proceedings to be secret. Since Howard and Ritter defied Rule 6(e) by selling transcripts, they committed a contempt as defined by section 401, (citation omitted) ... and since their contempt was perpetrated out of court, it falls within the prohibitions of section 1503.

569 F.2d at 1336.

This syllogism rests on a mistaken reading of *Nye v. United States,* 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941), which set out the history of the Act of March 2, 1831 (4 Stat. 487), the statute creating the contempt and obstruction statutes in language virtually identical to the current versions. It was conceded in *Nye* that the 1831 Act was passed to curtail the *summary* contempt powers of federal courts. *Nye* held that the 1831 Act limited the contempt powers of federal courts by precluding *summary* punishment of contempts consisting of misbehavior obstructing justice unless the behavior took place in the physical proximity of the court. 313 U.S. at 48–49, 61 S.Ct. at 815–16. It did not speak to or curtail the nonsummary power of courts to punish contempts after notice and a hearing, and it did not rule, contrary to the *Howard* court's theory, that the creation of the obstruction statute divested the courts of the power to punish *all* contempts occurring outside the actual presence of the court and left only the alternative of prosecution under the obstruction statute.

Instead, if obstructive behavior occurs within the proximity of the court, it may be punished under 18 U.S.C. § 401(1), under nonsummary notice and hearing procedures of Rule 42(b), *see, e.g., Higgins v. United States,* 160 F.2d 223 (D.C.Cir.1946), *cert. denied,* 331 U.S. 840, 67 S.Ct. 1511, 91 L.Ed. 1851 (1947) (an attempt to influence a juror in the corridor of the courthouse was punishable as contempt), and, as both *Friedman,* 445 F.2d at 1078, and *Howard,* 569 F.2d at 1336, recognized, misappropriation of secret grand jury records and transcripts is a contempt violating the secrecy requirement of Rule 6(e), which as a violation of a court rule is punishable as a contempt even though occurring outside the presence of the court, provided the procedures of Rule 42(b) are followed. *See* 3 C. Wright, Federal Practice and Procedure, § 703, at 819 (1982); Note, *Procedures for Trying Contempts in the Federal Courts,* 73 Harv.L.Rev. 353 (1959). There is therefore no necessity for punishing misappropriation of grand jury information under the obstruction statute lest it escape punishment altogether.

In addition, construing the theft and obstruction statutes to criminalize misappropriation of grand jury information violates the sound and firmly established principle that federal substantive criminal statutes should be construed in a limited manner, unless Congress plainly states an intention that the statute be liberally construed, as in the RICO statute discussed in Justice Blackmun's opinion for the Court in *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). The two reasons for this principle of limited construction are the requirement of clear public notice of criminal laws and respect for limitations on jurisdiction which contributes to the systematization of law and to individual liberty.

The danger of neglecting the principle of limited construction is plain: under the Court's view, the improper release of all confidential judicial information—including judicial opinions, votes and panel assignments—would constitute theft of government property and an obstruction of justice. The Court establishes no limiting principle. A lawyer or newspaper reporter would apparently go to jail if she finds out by stealth in advance what panel of the Sixth Circuit will hear a case or when an opinion will be released or what it will hold. The law clerks and secretaries of judges would be subject to criminal prosecution for telling tales out of school.

For the foregoing reasons these problems should continue to be handled by the courts under the contempt power, and the

language of the statutes in question should not be inflated to include them.