**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Theodore S. FORMAN, Defendant–
Appellant.**

No. 94–1731.

United States Court of Appeals,
Sixth Circuit.

Argued June 9, 1995.

Decided Dec. 21, 1995.

David Debold (argued and briefed), Alan M. Gershel, Office of the U.S. Atty., Detroit, MI, for U.S.

Theodore S. Forman (argued and briefed), Bradford, PA, pro se.

Before: WELLFORD, NELSON, and RYAN, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which NELSON, J., joined. WELLFORD, J. (p. 1220), delivered a separate concurring opinion.

RYAN, Circuit Judge.

The defendant, Theodore Forman,[1] appeals from his conviction and sentence following a jury verdict finding him guilty of criminal contempt in violation of 18 U.S.C. § 401(3). The conviction is based on Forman's alleged violation of the grand jury secrecy requirement imposed by Federal Rule of Criminal Procedure 6(e)(2). Before this court, appearing *pro se*, Forman raises numerous issues, but we shall address only the question whether Forman is subject to the secrecy requirement of Rule 6(e)(2); more specifically, whether he was an "attorney for the government" as that term is used in the rule.

We conclude that Forman was not "an attorney for the government," and so was not subject to the secrecy requirement of Rule 6(e)(2). Consequently, his conviction for criminal contempt must be reversed.

---

1. The defendant was born Theodore Formanczyk, Jr. In January 1990, he changed his name to Theodore Forman.

## I.

Forman was born and raised in Detroit, Michigan, earning his *juris doctor* in 1989. He was admitted to the bar and in August 1990, obtained a job with the United States Justice Department, where he worked as a trial attorney prosecuting criminal tax cases in the criminal enforcement section of the Tax Division in Washington, D.C.

During 1992, the Organized Crime Strike Force of the United States Attorney's Office in Detroit, Michigan, began an investigation of Vito Giacalone and his attorney, Nathaniel C. Deday LaRene. Giacalone has been publicly identified as a reputed leader of the Detroit mafia. Initially, the Giacalone/LaRene investigation focused on allegations of extortion and money laundering. The United States District Court for the Eastern District of Michigan convened a grand jury as part of this investigation. The alleged victim of the extortion, Albert Allen, refused to testify that the approximately $500,000 that he had paid to Giacalone through LaRene was extorted from him. The focus of the investigation then turned to tax evasion, as the $500,000 had never been declared as income. Special Agent Frank Scartozzi of the IRS was assigned to the investigation, and he subsequently prepared a Special Agent's Report (SAR) that detailed his findings. Included in this 1200-page report were transcripts from the grand jury proceedings; the names, addresses, and, in some cases, telephone numbers of witnesses who had testified before the grand jury; a summary of the government's investigation; a statement of the government's theory for the prosecution of the case; and a discussion of potential defenses to the prosecution.

Generally, the United States Attorney for each district has the discretion to prosecute criminal cases arising within his or her district. However, all potential criminal tax evasion prosecutions must be approved by the Tax Division of the Justice Department in Washington, D.C. The United States At-

torney therefore forwards all such case files to the criminal enforcement section where an attorney reviews the files and determines whether a criminal prosecution should be brought. Sometime around March of 1992, the United States Attorney for the Eastern District of Michigan sent the case file for the Giacalone/LaRene investigation to the Tax Division in Washington. The case was sent to the Northern Region Criminal Enforcement Section and was assigned to Curtis Nash, who was Forman's office mate. Although the case file contained grand jury material, it was not kept in a secret or secure location; rather, it was kept in an open area, to which everyone who worked in the enforcement section had access, in a box marked "Giacalone/LaRene."

In October 1992, federal agents conducting a separate investigation against Giacalone executed a search warrant at Giacalone's office. They unexpectedly found a photocopy of Special Agent Scartozzi's SAR for the Giacalone/LaRene case. At this time, the grand jury investigation against Giacalone and LaRene was ongoing.

Special Agents of the FBI began an investigation to determine how Giacalone had obtained a copy of the SAR. The special agents began by interviewing everyone in the Justice Department office in which the Giacalone/LaRene file was kept. The special agents learned that Forman's fingerprints were on some of the photocopied pages. On January 13, 1993, Special Agent Mark Kupferer interviewed Forman. At first, Forman told Kupferer that he had no recollection of seeing the SAR, except perhaps when he discussed the case with Nash. Forman stated that he definitely did not discuss the case with anyone outside the Tax Division and had not photocopied the SAR. When Special Agent Kupferer told Forman that his fingerprints had been found on the photocopies found in Giacalone's office, Forman suggested that he must have handled the original report and that his fingerprints had been transferred during the copying. Special Agent Kupferer told Forman that this was impossible. Forman then suggested that some of the originals containing his fingerprints must have been intermingled with the photocopies. Kupferer replied that all the pages seized from Giacalone's office had been copies, not the original pages. Forman asked whether he was the target of the investigation, and when Kupferer replied that he was, Forman terminated the interview.

One month later, Forman had retained an attorney and they met with Special Agent Kupferer. Forman told Kupferer that he had indeed photocopied the SAR, but he asserted that he did it under duress because he believed that his father's life was in danger if he did not provide assistance to the Giacalone family. The story that Forman told to Kupferer formed the basis of his defense at trial. Because Forman himself did not testify, the duress story was presented to the jury only when defense counsel drew the story out from Kupferer on cross-examination. Although, as will be discussed below, the jury apparently did not completely accept Forman's duress story, and the district court specifically found at sentencing that the duress story was not credible, the story does have some elements of truth.

When Forman was growing up in Detroit, he lived on the same block as Paul Corrado, with whom Forman formed a life-long friendship. Paul Corrado's father, Anthony Corrado, is a reputed member of the Giacalone organized crime syndicate. Forman's mother, Helen Formanczyk, amassed sizable gambling debts and Forman asserts that she squandered the entire family savings. At some point, she turned to narcotics trafficking and was arrested and convicted in 1990. She is currently serving an 11-year federal sentence. Forman told Kupferer that after his mother was imprisoned, men began to visit Forman's father, Theodore Formanczyk Sr., demanding to be paid for Helen Formanczyk's debts. Forman told Kupferer that when he, Forman, discussed the threats with his friend Paul Corrado, Corrado allegedly told Forman that the men were serious about collecting Helen Formanczyk's debts. Forman told Kupferer that he asked Paul Corrado if there was anything that Corrado could do to protect Mr. Formanczyk. Corrado responded that he would help if Forman obtained information that would help Giacalone "beat the case."

During the last weekend in April 1992, Forman went to his office, took the SAR from the file, and used the office photocopier to copy the entire report. Forman then drove to Detroit and delivered the photocopy to Corrado. When Corrado later asked Forman for more information, he lied to Corrado, stating that he could not obtain the information requested.

A grand jury indicted Forman on two counts: one count of obstruction of justice in violation of 18 U.S.C. § 1503, and one count of criminal contempt in violation of 18 U.S.C. § 401(3). At trial, Forman raised the affirmative defense of duress. After a three-day trial, the jury deliberated for a day and a half before returning a verdict of not guilty on the obstruction of justice count and guilty on the criminal contempt count.

At sentencing, the district court determined the appropriate guidelines range was 15 to 21 months imprisonment. The district court departed upward, sentencing Forman to 36 months. Forman then timely filed a notice of appeal.

## II.

### A.

 Forman was indicted and convicted under 18 U.S.C. § 401(3), which declares that "[d]isobedience ... to [a court's] lawful ... rule" can be punished as criminal contempt. The rule that the government alleges Forman disobeyed, and upon which the indictment and conviction were based, is Fed. R.Crim.P. 6(e)(2), which prohibits specified persons from disclosing matters occurring before a grand jury. Forman argues that while he did disclose grand jury materials, he was not one of the persons to whom Rule 6(e)(2) applies and, therefore, his actions did not violate the rule. Because he was not a person covered by the rule, Forman argues, the district court erred when it refused to dismiss the criminal contempt count of the indictment. Forman's appeal, then, requires that we interpret the scope of Fed.R.Crim.P. 6(e)(2), which is a question of law we determine de novo.

### B.

The starting point to discern the scope of Fed.R.Crim.P. 6(e)(2) is the text of the rule itself. Rule 6 governs grand jury proceedings. Rule 6(e)(2), "General Rule of Secrecy," provides:

A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, *an attorney for the government,* or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

(Emphasis added.)

"Attorney for the government" is not defined in Rule 6. Rather, the term is one that is used throughout the Federal Rules of Criminal Procedure, and so has a "global" definition contained in Fed.R.Crim.P. 54(c). In relevant part, that rule defines the term as "the Attorney General, *an authorized assistant of the Attorney General,* a United States Attorney, [or] an authorized assistant of a United States Attorney." (Emphasis added.) There is no dispute that, as a special attorney in the Justice Department, Forman was an assistant of the Attorney General. Our inquiry narrows, then, to determining the meaning of the term "authorized" in the expression "authorized assistant of the Attorney General." This term is nowhere defined in the rules.

Forman argues that "authorized" is a modifier that limits "attorney for the government" to only those assistants of the Attorney General who are specifically assigned, that is, "authorized" by their superiors, to work on a particular grand jury proceeding. Under Forman's theory, even his former office mate Curtis Nash would not be covered by Rule 6(e)(2) because, although Nash was assigned to work on the Giacalone/LaRene case, he was not assigned to work on the grand jury proceeding itself. The government takes the position that "authorized" is a modifier that places almost no limit on the

definition of "attorney for the government." The government argues that one is an "authorized" assistant of the Attorney General or of a United States Attorney when one has been duly appointed and sworn into office.

For the reasons that follow, we reject the government's position because it is too broad. While we agree that some delegation or assignment is necessary before one is an "*authorized* assistant of the Attorney General," we need not fully decide the merits of Forman's narrow position because, as we shall explain, Forman was not assigned to work on the Giacalone/LaRene case in *any* official capacity. We therefore need not decide what type of delegation or assignment constitutes an authorization for purposes of Rule 54(c). We agree with Forman's conclusion that he was not subject to Rule 6's secrecy requirement, and so his conviction for criminal contempt must be reversed.

### III.

### A.

Forman relies on two cases for the proposition that he was not "an attorney for the government" and so not covered by Rule 6(e)(2)'s secrecy requirement. In *United States v. Jeter*, 775 F.2d 670 (6th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986), this court made two holdings relevant to this appeal: 1) only those persons covered by the language of Rule 6(e)(2) can be charged with criminal contempt stemming from disclosure of grand jury materials; and 2) those persons not subject to Rule 6(e)(2)'s secrecy requirement can nevertheless be prosecuted for obstruction of justice for obtaining and divulging grand jury material. *Jeter* did not involve a defendant who had been a government attorney, so that case did not decide the precise issue here.

In the other case on which Forman relies, *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), the Court likewise was not faced with the issue that this appeal presents. In *Sells Engineering*, the issue was whether a government attorney who worked in the Criminal Division of the United States Justice

Department could, without a court order, disclose grand jury materials to another government attorney to be used in a civil case against the target of the grand jury proceedings. The government argued that disclosure was appropriate without court order under Rule 6(e)(3)(A)(i), which allows disclosure to any government attorney when the grand jury material would be used "in the performance of such attorney's duty." The government argued that government attorneys prosecuting civil cases were included within this exception. The Court disagreed:

> We hold that (A)(i) disclosure is limited to use by those attorneys who conduct the criminal matters to which the materials pertain. This conclusion is mandated by the general purposes and policies of grand jury secrecy, by the limited policy reasons why Government attorneys are granted access to grand jury materials for criminal use, and the by the legislative history of Rule 6(e).

463 U.S. at 427, 103 S.Ct. at 3140. The Court held that if a government attorney desires grand jury materials to conduct civil litigation, the government must seek court approval under Rule 6(e)(3)(C)(i).

█ Although *Jeter* and *Sells Engineering* inform our analysis, neither is dispositive of the issue presented in this case because neither case determined the scope of the term "authorized" as it is used in Rule 54(c). That term, in the context in which it appears, is ambiguous because its meaning cannot be determined by reference to the text of the rule itself: the term is susceptible to various readings, and the text does not inform the court which of the possible readings is appropriate. We turn, therefore, to the historical materials and usual tools of interpretation.

### B.

We first note that because Rule 54(c) provides a global definition of the term "attorney for the government," the definition it provides will not be specifically tailored to attorneys for the government in the context of grand jury proceedings governed by Rule 6. The advisory committee notes that accompanied Rule 54 when it was adopted in 1944 provide some guidance regarding the

definition of "attorney for the government." The notes refer the reader to statutory sections that establish the Justice Department and provide the Attorney General with the power to appoint government attorneys. Fed.R.Crim.P. 54(c) advisory committee's note. Of particular interest here are the predecessors to 28 U.S.C. § 515,[2] one of which provides in relevant part:

**Authority for legal proceedings; commission, oath, and salary for special attorneys**

(a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, *when specifically directed by the Attorney General,* conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are *authorized by law to conduct,* whether or not he is a resident of the district in which the proceeding is brought.

(b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law.

(Emphasis added.) One United States Attorney is appointed to each judicial district, 28 U.S.C. § 541, and the Attorney General may appoint Assistant United States Attorneys in each district. 28 U.S.C. § 542(a). The United States Attorney and the Assistant United States Attorneys must, with minor exceptions, reside in the district to which they are appointed, 28 U.S.C. § 545, and their authority pertains to the district to which they are appointed. 28 U.S.C. § 547. This statutory scheme provides the context in which the term "authorized" in Rule 54(c) should be read.

Federal Rule of Criminal Procedure 1 states that those rules "govern the procedure in all criminal proceedings in the courts of the United States." The statutory scheme set out above indicates that not all Assistant United States Attorneys and not all assistants to the Attorney General may participate in any "criminal proceeding" in a federal court. The United States Attorneys' authority is district specific, and while the assistants to the Attorney General are not limited by residency to any specific district, section 515(a) directs that they may participate in a criminal proceeding only when "specifically directed by the Attorney General." 28 U.S.C. § 515(a). The term "authorized assistant of the Attorney General" in Rule 54(c) would seem to mean, then, an assistant to whom the Attorney General had delegated the authority to act in a particular criminal proceeding.

■ Rule 6(d) provides a list of those persons who may be present during the grand jury proceedings. Rule 6(e)(2)'s list of persons governed by the secrecy requirement is nearly identical to the list in 6(d) with one conspicuous deletion: witnesses appearing before the grand jury are not subject to Rule 6(e)(2)'s secrecy requirement. The advisory committee notes that accompanied the 1944 adoption of the rules make clear that this list of persons in Rule 6(e)(2) was based on the list in 6(d), with the one omission being intentional. Fed.R.Crim.P. 6 advisory committee's note. A special attorney whom the Attorney General directed to participate in the grand jury proceedings pursuant to sections 515(a) & 543 would be an "authorized assistant of the Attorney General" under Rule 54(c) and, consequently, an "attorney for the government" subject to the secrecy requirement of Rule 6(e)(2). Such a conclusion should raise no controversy.

■ From this line of reasoning, however, Forman draws the conclusion that *only* assistants to the Attorney General who have been directed to participate in the grand jury proceedings are "authorized" as that term is used in Rule 54(c). Although we need not decide the issue, it does not necessarily follow that *only* such an attorney is "authorized" under Rule 54(c). However, whatever the full scope of the term "authorized" in

---

**2.** 28 U.S.C. § 515(a) was formerly codified at 5 U.S.C. § 310, and 28 U.S.C. § 515(b) was formerly codified at 5 U.S.C. § 315.

Rule 54(c) may be—a question we do not decide today—as a modifier of "assistant of the Attorney General," the term assumes some specific delegation or assignment by the Attorney General. Therefore, we must reject the government's assertion that the term "authorized" in Rule 54(c) refers to *any* assistants to a United States Attorney or to the Attorney General who have been duly appointed and taken the oath of office. We conclude that for purposes of Rule 54(c) an "*authorized* assistant of the Attorney General" is one whose superiors have assigned him or her to work in some official capacity on the criminal proceeding.

■ The government makes the alternative argument that even if the term "authorized" in Rule 54(c) requires that an assistant of the Attorney General function in an official capacity, Forman is still covered by the rule because he was acting in his official capacity when he informally discussed the case with Nash, with whom he shared an office. We reject this argument. We believe it strains the common understanding of the word "authorized" to suppose that by virtue of sharing an office one is authorized to work on the other attorney's cases. Forman was in little better position than an eavesdropper, although Nash willingly brought Forman into the conversation. We cannot accept that a casual conversation between peers is equivalent to an official delegation or assignment.

In summary, we hold that the term "authorized" in Rule 54(c) requires some level of official delegation or assignment. We need not decide the precise scope of the term "authorized" because it is enough for the resolution of this appeal to note that Forman was not assigned to work on the Giacalone/LaRene case in any official capacity. The term "authorized" in Rule 54(c) requires more than simply working in the same section of the Justice Department or even in the same office to which a case has been assigned. The government failed to demonstrate that the Attorney General in any way delegated or assigned to Forman the authority to work on the Giacalone/LaRene case. Consequently, the district court erred when it declined to dismiss the criminal contempt count of the indictment.

## C.

■ We note that the result in this case, that is, that Forman will be free from any criminal liability for his actions, is an aberration. As we held in *Jeter*, one who divulges grand jury materials but is not subject to Rule 6(e)(2) is still liable to prosecution under 18 U.S.C. § 1503 for obstruction of justice. Forman was indicted for obstruction of justice, but the jury acquitted him on that count. At trial, Forman asserted the affirmative defense of duress; that is, he admitted the conduct, but asserted that the alleged threats to his father absolved him of criminal culpability. Looking only at the duress defense and not at the different elements of each offense, only two alternative verdicts would logically be appropriate: guilty on both counts if the jury did not believe the duress story, or not guilty on both counts if the jury believed the duress story.

Forman informed the court that in a post-verdict interview with the jury foreperson, the foreperson stated that the jury members had believed that threats were made against Forman's father, but the jury members also believed that Forman had enough time to seek help from law enforcement authorities. The jury instruction on the defense of duress required the jury to find that Forman had a reasonable belief that there would be immediate death or serious bodily injury and that Forman had no time to seek help from the authorities. Having taken an oath to render a verdict in accord with the law, if the jury found the facts to be as the foreperson reported them, then its verdict, although certainly within its *power*, was not within its proper *authority* to render.

## IV.

For the reasons stated above, Forman's conviction for criminal contempt under 18 U.S.C. § 401(3) is **REVERSED**.

WELLFORD, Circuit Judge, **concurring**.

I concur in my colleague's analysis of the difficult issues in this case, and to this judge, the abhorrent result reached. It is unfortunate that the jury did not reverse its hold-

ings—finding Forman guilty of obstruction of justice and for the reasons we have stated, finding him not guilty of criminal contempt. At least the Justice Department has rid itself of an unfaithful employee, and one can only hope it has tightened its security on active criminal files and investigations.